**INTERMATIC INCORPORATED,**
Plaintiff,

v.

**Dennis TOEPPEN, Defendant.**

No. 96 C 1982.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 26, 1996.

John K. Lucas, Barbara A. Larsen, Brinks Hofer Gilson & Lione, Chicago, IL; for Plaintiff.

Joseph D. Murphy, Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, P.C., Champaign, IL, for Defendant.

## ORDER

ANN CLAIRE WILLIAMS, District Judge.

The court has carefully reviewed Magistrate Judge Denlow's report and recommendation ("R&R"), the objections of defendant Toeppen, and the responses of plaintiff Intermatic Inc. Toeppen's main objection is that the R&R failed to consider whether a domain name has the inherent attribute of a trademark. Defendant's objection rests on the underlying fact that the internet is a new medium of communication. Although it is a new medium, courts must still apply traditional trademark law, while also considering the policy implications. Magistrate Judge Denlow's R&R does just that. By applying

the law of trademarks to the internet, Magistrate Judge Denlow strikes an appropriate balance between trademark law and the attendant policy concerns raised by the defendant. *See Panavision International, L.P. v. Toeppen,* No. 96 C 3284, 1996 WL 653726 (C.D. Cal. Nov. 5, 1996).

Additionally, the court grants Intermatic's motion to strike the declaration of Patricia L. Gruber because a party may not hold back in the proceeding before the magistrate judge on the basis that additional affidavits or exhibits will be submitted to the district judge. The referral of the motion to the magistrate requires all parties to make the same presentation they would have submitted to the district judge. *See Schaap v. Executive Industries, Inc.,* 760 F.Supp. 725, 728 n. 3 (N.D.Ill. 1991); *Anna Ready Mix, Inc. v. N.E. Pierson Const. Co.,* 747 F.Supp. 1299, 1303 (S.D.Ill.1990)(citing *Paterson-Leitch Company, Inc. v. Massachusetts Municipal Wholesale Electric Company,* 840 F.2d 985, 990-91 (1st Cir.1988)); 7 James Wm. Moore, *Moore's Federal Practice* ¶ 72.04, p. 72-63 (2d ed. Sept. 1996). Assuming arguendo that the court allowed the declaration of Patricia L. Gruber to stand it would not change the court's decision.

Magistrate Judge Denlow's report and recommendation dated October 28, 1996 is adopted in full and supplemented by this Minute Order. Intermatic's motion for summary judgment is granted in part as to counts III and IV, denied as to counts I, II, V, VI, and VII, and Toeppen's motion for summary judgment is denied as to all counts. The court also grants Intermatic's motion to strike the declaration of Patricia L. Gruber. The parties are instructed to discuss settlement before the next status hearing scheduled in this case.

### *REPORT AND RECOMMENDATION*

DENLOW, United States Magistrate Judge.

Welcome to cyberspace! This case presents the Court with the increasingly important issue of whether and how federal and state trademark laws apply to govern names selected by users for their Internet website. As the Internet grows in prominence as a venue for business, the courts will be called upon to apply traditional legal principles to new avenues of commerce. This is such a case.

Plaintiff Intermatic Incorporated ("Intermatic"), brings this action in seven counts against defendant Dennis Toeppen ("Toeppen"). Intermatic alleges that Toeppen's use of the Internet domain name "intermatic.com" violates sections 32(1) (Federal Trademark Infringement) (count I), 43(a) (Federal Unfair Competition) (count II), and 43(c) (Federal Trademark Dilution Act of 1995) of the Lanham Act (count III). 15 U.S.C. § 1114(1); 15 U.S.C. § 1125(a); and 15 U.S.C. § 1125(c) respectively. Intermatic also alleges that Toeppen's conduct violates the Illinois Anti–Dilution Act, 765 ILCS 1035/1 *et. seq.* (count IV); the common law of unfair competition (count V); the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et. seq.* (count VI); and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2. (count VII). Toeppen denies that his conduct is unlawful.

Intermatic and Toeppen have filed cross-motions for summary judgment on all seven counts. The Court held extensive oral argument on August 29, 1996 and has reviewed the briefs, stipulations, affidavits and exhibits submitted by the parties. For the reasons set forth below, the Court recommends that Intermatic's motion for summary judgment be granted as to counts III and IV (the "Dilution counts") and be denied as to the remaining counts. The Court recommends that Toeppen's motion be denied as to all counts.

### I. BACKGROUND FACTS

#### A. The Parties.

Intermatic is a Delaware corporation having a place of business in Spring Grove, Illinois. Intermatic has been doing business under the name INTERMATIC since 1941. Intermatic has 37 offices throughout the United States and has been in business in Illinois since 1892. Intermatic is a manufacturer and distributor of a wide variety of electrical and electronic products, including computerized and programmable timers and

other devices which are sold under the name and trademark INTERMATIC.

Intermatic's sales and advertising of INTERMATIC labeled products have been continuous since the 1940's. (SF ¶ 6).[1] In the last 8 years, its sales in the U.S. have exceeded $850 million. *Id.* Intermatic's products prominently bear the INTERMATIC name and trademark, and well over 100 million units have been installed in homes and businesses throughout the United States. (SF ¶¶ 6, 9).

Advertising and promotional expenditures for products bearing the INTERMATIC mark for the last 8 years have exceeded $16 million. (SF ¶ 7). Intermatic's co-op advertising consists of approximately 700 print ads per year, with each displaying the INTERMATIC mark. Intermatic also advertises and promotes its INTERMATIC products, mark and name by way of trade shows throughout the United States, magazines, point-of-purchase displays, brochures, radio, and television. (12 M ¶¶ 12, 31, 32).

Defendant Toeppen resides in Champaign, Illinois, where he operates an Internet service provider business known as Net66. Toeppen has registered approximately 240 Internet domain names without seeking the permission from any entity that has previously used the names he registered, because he contends that no permission was or is necessary. Among the domain names which he has registered are the following well known business names:

| | |
|---|---|
| deltaairlines.com | greatamerica.com |
| britishairways.com | neiman-marcus.com |
| crateandbarrel.com | northwest airlines.com |
| ramadainn.com | ussteel.com |
| eddiebauer.com | unionpacific.com |

One of Toeppen's business objectives is to profit by the resale or licensing of these domain names, presumably to the entities who conduct business under these names.

**B. Intermatic's Trademarks.**

Intermatic owns five incontestable trademark registrations issued by the U.S. Patent and Trademark Office for its INTERMATIC mark. (SF ¶ 4, Ex. 2). Intermatic is the exclusive owner of the INTERMATIC trademark and trade name, and there are no known third party uses of INTERMATIC in the U.S. (SF ¶¶ 4, 11, Ex. 2). Prior to registering the intermatic.com domain name, Toeppen had never used the term intermatic for any purpose.

**C. The Internet.**

**1. Domain Names.**

The Internet is a vast and expanding network of computers and other devices linked together by various telecommunications media, enabling all the computers and other devices on the Internet to exchange and share data.

The Internet provides information about a myriad of corporations and products, as well as educational, research and entertainment information and services. An estimated 30 million people worldwide use the Internet with 100 million predicted to be on the "net" in a matter of years.[2]

A computer or device that is attached to the Internet is often referred to as a "host." In order to facilitate communications between hosts, each host has a numerical IP (Internet protocol) address.[3] The IP address is comprised of four groups of numbers separated by decimals. For example, the IP address of one of Toeppen's host computers is 206.139.80.66. Each host also has a unique "fully qualified domain name." The "fully qualified domain name" may not be repeated in the Internet. In the case of 206.139.80.66, the "fully qualified domain name" is "winslow.net66.com".

In its most generic form, a fully qualified domain name consists of three elements.

---

**1.** SF refers to the Stipulation of Facts filed by the parties.

**2.** The Internet is described, in detail in *MTV Networks v. Curry,* 867 F.Supp. 202, 203–04, fns. 2 and 3 (S.D.N.Y.1994) and *Religious Technology Center v. Netcom On–Line Comm. Services, Inc.,* 907 F.Supp. 1361, 1365 (N.D.Cal.1995).

**3.** For a discussion of Internet naming conventions see, Kenneth S. Dueker, *Trademark Law Lost in Cyberspace: Trademark Protection For Internet,* 9 Harv. J.L. & Tech 483, 492–7 (1996).

Taking "winslow.net66.com" as an example, the three elements are the hostname ("winslow"), a domain name ("net66") and a top level domain ("com"). A given host looks up the IP addresses of other hosts on the Internet through a system known as domain name service.

Domain name service is accomplished as follows: The Internet is divided into several "top level" domains. For example, "edu" is a domain reserved for educational institutions, "gov" is a domain reserved for government entities and "net" is reserved to networks. Although "com" is short for "commercial," it is a catchall domain and the only one generally available to Internet users that have no special attributes i.e., they are not a school or a government office or a network. Each domain name active in a given top-level domain is registered with the top level server which contains certain hostname and IP address information.

In order to access the Internet, most users rely on programs called "web browsers." Commercially available web browsers include such well-known programs as Netscape and Mosaic. If an Internet user desires to establish a connection with a web page hosted at winslow.net66.com, the Internet user might enter into a web browser program the URL "http: www.net66.com." (URL stands for uniform resource locator.) The first element of the URL is a transfer protocol (most commonly, "http"—standing for hypertext transfer protocol). The remaining elements of this URL (in this case, "www"—standing for World Wide Web—and "net66.com") are an alias for the fully qualified domain name of the host winslow.net66.com. Once a URL is entered into the browser, the corresponding IP address is looked up in a process facilitated by a "top-level server." In other words, all queries for addresses are routed to certain computers, the so-called "top level servers". The top level server matches the domain name to an IP address of a domain name server capable of directing the inquiry to the computer hosting the web page. Thus, domain name service ultimately matches an alphanumeric name such as www.net66.com with its numeric IP address 206.139.80.66.

**2.  Registration of Domain Names.**

Domain names using the suffix ".com" are established by registration with an organization called Network Solutions, Inc. ("NSI"). Registration of the other available top-level domain names, "edu," "gov" and "net", is handled by other organizations. With some limitations, NSI will register any combination of up to 24 alphanumeric characters as a domain name on a first-come, first-served basis to anyone who has access to at least two domain name servers. A domain name server is a host computer with software capable of responding to domain name inquiries and accessible on a full-time basis to other computers on the Internet. Registering a domain name is the step that allows the top-level servers within the Internet to know where the domain name servers or hosts associated with those domain names are located in the Internet. The cost for a domain name registration is currently $100. Domain name service can be operated by the domain name holder or obtained from any entity with the proper computer equipment, including hundreds of Internet service providers.

**3.  Web Pages.**

One way to establish a presence on the Internet is by placing a web page, which is, ultimately, a computer data file on a host operating a web server within a given domain name. When the web server receives an inquiry from the Internet, it returns the web page data in the file to the computer making the inquiry. The web page may comprise a single line or multiple pages of information and may include any message, name, word, sound or picture, or combination of such elements. Most web browsers will show somewhere on the screen the domain name of the web page being shown and will automatically include the domain name in any printout of the web page. There is no technical connection or relationship between a domain name and the contents of the corresponding web page.

There are a number of ways for an Internet user to find a web page. Web browsers feature access to various indexes, commonly referred to as search engines. Well-known

indexes include InfoSeek Guide, Lycos, Magellan, ExCite and Yahoo. These indexes will allow the user to enter a name or a word or a combination of words, much like a Lexis or WestLaw search, and will return the results of the search as a list of "hyperlinks" to web pages that have information within or associated with the document comprising the page responding to the search.

### 4. Hyperlinks.

A hyperlink is a link from one site on the Internet to a second site on the Internet. "Clicking" on a designated space on the initial page which references the subsequent site by a picture, by some highlighted text or by some other indication will take a person viewing the initial web page to a second page. In addition to their use in indexes, hyperlinks are commonly placed on existing web pages, thus allowing Internet users to move from web page to web page at the click of a button, without having to type in URLs.

Hyperlinks can be and commonly are established without reference to the domain name of the second site. A hyperlink for the Champaign–Urbana map page might be a picture of a map or a statement such as "a map of Champaign–Urbana" or, more simply, "Champaign–Urbana." A hyperlink is not technically related to a domain name and therefore it can be identical to an existing domain name without conflicting with that domain name. For example, were Intermatic to establish an Intermatic home page at http: www.xyz.com, any number of indexes could be employed and hyperlinks could be established to bring up the page through use of the word INTERMATIC.

### D. The Dispute.

In December of 1995, Toeppen applied for registration of the domain name http: www.intermatic.com ("intermatic.com") and NSI registered the domain name to Toeppen's domain name servers. A given domain name, the exact alphanumeric combination in the same network and using the same suffix, can only be registered to one entity. Intermatic subsequently attempted to register the same domain name and was prevented from registering "intermatic.com" as its domain name because of Toeppen's prior registration of that domain name.

Intermatic also became aware that Toeppen was using the mark "Intermatic" in connection with the sale of a computer software program. Upon discovery of Toeppen's prior registration and use of the Intermatic mark, Intermatic made a written demand on Toeppen that he relinquish or assign the "intermatic.com" domain name registration and discontinue use of the Intermatic mark. Toeppen agreed to discontinue using the Intermatic mark for his software product but refused to give up the "intermatic.com" domain name registration. In response to a formal request by Intermatic, NSI put Toeppen's registration on hold in April of 1996.

As long as Mr. Toeppen is allowed to retain the "intermatic.com" registration, Intermatic will be unable to acquire "intermatic.com" as an Internet domain name or use "intermatic.com" as an e-mail address on the Internet. However, Intermatic is technically capable of establishing its web page at another domain name, including, for example, "intermatic-inc.com" and it is technically capable of establishing at any available domain name a web page featuring the INTERMATIC mark and any other Internet-related marketing or business information. To date, Intermatic has not chosen to reserve any other domain name or to take any other action to establish a presence on the Internet. However, some of its distributors have placed Intermatic information on the Internet.

Until NSI placed the intermatic.com domain name on hold, Toeppen maintained intermatic.com as an active domain name on the Internet. Although he initially set up a web page regarding a software program he was developing and intended to call "Intermatic," Toeppen removed that page (which was available for less than a week) and dropped the proposed name for his software in response to demand from Intermatic. No software programs were ever sold. He then instituted as a web page a map of Champaign–Urbana, the community where Toeppen resides.

When Toeppen became aware of Intermatic's efforts to have the intermatic.com domain

name placed on hold, he changed the web page associated with intermatic.com to bear the caption "Champaign–Urbana Map Page/has Moved To www.c-u.com." Toeppen moved the map and put the forwarding address on the intermatic.com page so that Internet users could update relevant hyperlinks before the NSI freeze simply locked them out of the page, as is now the case. Presently, entering intermatic.com will return a message that there is no functional domain name server at that domain name.

At no time did Toeppen use intermatic.com in connection with the sale of any available goods or services. At no time has Toeppen advertised the intermatic.com domain name in association with any goods or services. Presently, the intermatic.com domain name is not available for use by any party. Toeppen did not seek permission from Intermatic to use the intermatic.com domain name because he believes that no permission was or is necessary. Intermatic disagrees. This litigation ensued.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *Celotex Corporation v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

When reviewing the record on summary judgment, the court must draw all reasonable inferences in the light most favorable to the nonmovant. *Hill v. Burrell Communications Group, Inc.,* 67 F.3d 665, 667 (7th Cir.1995). To avert summary judgment, however, plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, (1986). A dispute about a material fact is genuine only if the evidence presented is such that a reasonable jury could return a verdict for the nonmovant.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A summary judgment proceeding is not a vehicle for the resolution of factual disputes; it is designed to determine whether there is any material dispute of fact that requires a trial. *Id.* If no reasonable jury could find for the party opposing the motion, it must be granted. *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995). The fact that the parties have filed cross-motions for summary judgment does not necessarily mean that summary judgment must be entered for one side. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 349 (7th Cir.1983) ("... filing of cross-motions does not automatically empower district court to dispense with assessment of whether material fact questions exist.").

## III. LEGAL DISCUSSION

This case involves a dispute over the ownership of a highly prized Internet address. The issue is whether the owner of the Intermatic trademark may preclude the use of the trademark as an Internet domain name by defendant Toeppen, who had made no prior use of the Intermatic name prior to registering it as an Internet domain name. This case does not involve competing claims to the same name by parties who have actively used the same name in their business, such as the use of the term "United" by United Airlines, United Van Lines, United Mineworkers Union and the United Way.

■ Toeppen is what is commonly referred to as a cyber-squatter. *Miller, Cyber Squatters Give Carl's Jr., Others Net Loss, Los Angeles Times,* 1996 WL 11004750. These individuals attempt to profit from the Internet by reserving and later reselling or licensing domain names back to the companies that spent millions of dollars developing the goodwill of the trademark. While many may find patently offensive the practice of reserving the name or mark of a federally registered trademark as a domain name and then attempting to sell the name back to the holder of the trademark, others may view it as a service. Regardless of one's views as to the morality of such conduct, the legal issue

is whether such conduct is illegal. Cyber-squatters such as Toeppen contend that because they were the first to register the domain name through NSI it is theirs. Intermatic argues that it is entitled to protect its valuable trademark by preventing Toeppen from using "intermatic.com" as a domain name.

The practical effect of Toeppen's conduct is to enjoin Intermatic from using its trademark as its domain name on the Internet. Unlike the typical trademark dispute, where both parties are using the name simultaneously and arguing whether confusion exists, the current configuration of the Internet allows only one party to use the "intermatic.com" domain name. Because the Internet assigns the top-level domain name .com to commercial and non-commercial users, there does not currently appear to be a way in which both Intermatic and Toeppen can both use the intermatic.com name.

Congress and the states have been slow to respond to the activities of the cyber-squatters. Some commentators take an extremely dim view of their activities. As one commentator has noted: "There is no doubt that some of these pirates, if not most, anticipated a lottery-like bonanza, selling the domain registration to the trademark owner or canceling it in return for a huge amount of money." 1 Gilson, *Trademark Protection and Practice*, § 5.11[4], p. 5–237 (1996). "Dozens of companies, including Taco Bell, MTV, Kentucky Fried Chicken and others have had to cajole, pay thousands of dollars or even sue to gain the rights to domain names that match trademarks they have spent millions of dollars cultivating and protecting." *Miller, Cyber Squatters Give Carl's Jr., Others Net Loss. Los Angeles Times*, 1996 WL 11004750. However, becoming rich does not make one's activity necessarily illegal. Speculation and arbitrage have a long history in this country.

For the reasons set forth below, the Court recommends that Intermatic's motion for summary judgment be granted in part as to the Dilution counts III and IV and denied as to the remaining counts and Toeppen's motion be denied as to all counts. We will begin our analysis with a discussion of Intermatic's trademark and unfair competition claims (section IV) and we will then turn to its trademark dilution claims (section V).

## IV. INTERMATIC'S TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION CLAIMS—LIKELIHOOD OF CONFUSION.

■ Our discussion begins with an analysis of Intermatic's trademark and unfair competition claims. Intermatic asserts that it is entitled to summary judgment on all counts by showing the likelihood of confusion resulting from Toeppen's use of Intermatic's trademark as a domain name. In order to prevail under the federal trademark infringement claim, the federal unfair competition claim, and the state deceptive trade practices and unfair competition claims, (Counts I, II, V, VI, and VII), Intermatic need only prove that: 1) it owns prior rights in the INTERMATIC mark; and 2) Toeppen's use of "intermatic.com" is likely to cause consumer confusion, deception or mistake. *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376 (7th Cir.1996).[4]

Intermatic's name and prior rights over Toeppen to use the INTERMATIC name are clear. Intermatic's first use of the INTERMATIC name and mark predates Toeppen's first use of "intermatic.com" by more than fifty years. Also, it is undisputed that Intermatic holds a valid registration for the trademark INTERMATIC.

The Seventh Circuit has held that the following seven factors should be weighed to determine if there is a likelihood of confusion: 1) the degree of similarity between the marks in appearance and suggestion; 2) the similarity of products or services for which the name is used; 3) the area and manner of concurrent use; 4) the degree of care likely

---

4. One of the difficulties with the procedural posture of this case, is that the parties have persisted in proceeding on the basis of cross motions for summary judgment rather than on an agreed record for purposes of final resolution as permitted by Fed.R.Civ.P. 52(a). Under the summary judgment standard, the Court may not resolve factual disputes, but rather examines the record to determine whether a material dispute of fact exists.

to be exercised by consumers; 5) the strength of the complainant's mark; 6) actual confusion; and 7) an intent on the part of the alleged infringer to palm off his products as those of another. *Forum Corp. of North Am. v. Forum Ltd.*, 903 F.2d 434, 439 (7th Cir.1990). The test is not whether the public would confuse the marks, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected. *Nike, Inc. v. "Just Did It" Enterprises*, 6 F.3d 1225, 1228–29 (7th Cir.1993). Where factual issues exist on these criteria, the Seventh Circuit has clearly stated that summary judgment is inappropriate. *McGraw–Edison Company v. Walt Disney Productions*, 787 F.2d 1163, 1173 (7th Cir. 1986) ("the district court erred in concluding as a matter of law that no likelihood of confusion exist and in granting summary judgment in favor of defendants on count I"); *Nike, Incorporated v. "Just Did It" Enterprises*, 6 F.3d 1225 (7th Cir.1993) (reversing district court grant of summary judgment and holding that genuine issue of material fact existed as to whether parody of "Nike," "Just Do It" and swoosh symbol trademarks was likely to confuse consumers).

### 1. Similarity of Marks

In this case, Toeppen's use of "intermatic.com" is similar to the federally registered name and mark of INTERMATIC because it contains the term "intermatic." Each of the five registered INTERMATIC trademarks contain the Intermatic name. (SF ¶ 4 and Ex. 2 thereto).

### 2. Similarity of Products or Services

There is no similarity between the products and services that Toeppen and Intermatic provide. Toeppen's web page contained a map of the city of Urbana, whereas Intermatic's web page would presumably contain product information or catalogs of the various Intermatic products. At the present time, Intermatic has chosen to await the outcome of this litigation before initiating its own Internet web page. More importantly though, Toeppen is willing to be enjoined from using the website for the sale of any product or service thereby guaranteeing that his use would be entirely dissimilar from Intermatic's use.

### 3. The Area and Manner of Use

This factor requires the Court to "consider whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Forum Corp. of North Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir.1990). Also, a trademark protects the owner against not only its use upon the articles to which he has applied it but also upon such other articles as might naturally be supposed to come from him. *Nike, Inc. v. "Just Did It" Enterprises*, 6 F.3d 1225, 1228–29 (7th Cir.1993). Toeppen will not be selling any goods or services through the intermatic.com domain.

Both parties are attempting to establish a presence on the Internet through the creation of a web page. The distribution channel in this case is cyberspace. As consumers "surf the net" they seek out information on a plethora of subjects or companies. Companies around the globe are scrambling to establish their presence on the Internet. It is axiomatic that companies seek to register their trademarks as domain names so that consumers can easily find information about them or their products and services. However, at the present time, there is no area and manner of concurrent use. There is no bar to Intermatic setting up a web page under a name other than intermatic.com. Because Intermatic has not set up its own web page, it is unable to demonstrate any relationship in use, promotion, distribution or sales between the goods or services of the parties.

### 4. Degree of Care Likely To Be Exercised By Consumers

The record contains no information regarding consumer behavior on the Internet. The Court finds that the degree of care to be exercised by consumers raises a question of fact. The consumers in this case are individuals that log onto the Internet to seek information, products, or services. There has been no evidence presented as to the degree of care that could be expected among the

average Internet user. The Court cannot simply infer what degree of care would be used by consumers. Because this matter is before the Court on summary judgment, the Court infers that a fact question exists as to whether a web surfer who logged onto the intermatic.com web page and found a map of Urbana, Illinois would associate that page with Intermatic. *Nike, Inc. v. "Just Did It" Enterprises,* 6 F.3d 1225, 1230–31 (7th Cir. 1993). Thus, the Court finds that a fact question exists on this issue.

### 5. Strength of Intermatic's Mark

Toeppen does not contest the fact that Intermatic's mark is strong. The Court finds that the mark is strong and entitled to broad protection as a matter of law. As the Seventh Circuit noted in *Polaroid Corp. v. Polaroid Inc.,* 319 F.2d 830, 831 (7th Cir. 1963), a trademark or trade name that is a coined or invented word which has never been used as a trade name or trademark by any other entity acquires the status of a famous-brand trademark. The following language from Polaroid is applicable to the case at bar: "in the instant case plaintiff's trademark and trade name was original—it was coined and invented—and was a strong name exclusively appropriated by plaintiff. It was a name which through much effort and the expenditure of large amounts of money had acquired a widespread reputation and much good will, which plaintiff should not be required to share with defendant." *Id.* at 837.

### 6. Actual Confusion

There has been no evidence presented of actual confusion. Intermatic states that the use of the "intermatic.com" domain name in and of itself would cause confusion. However, this is a question of fact to be determined. *Nike, Inc. v. "Just Did It" Enterprises,* 6 F.3d 1225, 1231 (7th Cir.1993).

### 7. Toeppen's Intent

Intermatic argues that Toeppen's registration of more than 200 domain names is indicia of willful intent. However, Toeppen ar-

gues that he was motivated in part to test the legality of arbitraging domain names. This is a relatively new area of law and Toeppen is free to test the waters. There has been no evidence that Toeppen intended to pass off any of his products or services as Intermatic's. Neither the software nor the map of Urbana are in anyway similar to Intermatic's products. He immediately ceased to market the software under the Intermatic name when contacted by Intermatic's counsel. Whether Toeppen's registration of several domain names is sufficient to rise to the level of willful intent is also a question of fact. *Id.* at 1231–32.

Therefore the Court recommends that since there are questions of fact as to a likelihood of confusion, the parties' cross motions for summary judgment as to counts I, II, V, VI, and VII should be denied.

## V. INTERMATIC'S DILUTION CLAIMS

■ The parties also move for summary judgment on the Dilution claims. The issue squarely presented is whether the Federal Trademark Dilution Act of 1995 and the Illinois Anti–Dilution Act protect Intermatic from having its federally registered trademarks used as a domain name by Toeppen. For the reasons set forth below the Court holds that Toeppen's action in registering and using "intermatic.com" as a domain name violates section 43(c) of the Lanham Act and the Illinois Anti–Dilution Act because it lessens the capacity of a famous mark, Intermatic, to identify and distinguish goods or services as a matter of law.

### A. History of Dilution Statutes.

The concept of trademark dilution dates back[5] to an article written by Frank I. Schechter and published in the Harvard Law Review in 1927. *The Rational Basis of Trademark Protection,* 40 Harv. L.Rev. 813 (1927). Schechter explained that the true function of a trademark is "to identify a product as satisfactory and thereby to stimulate further purchases by the consuming pub-

---

**5.** See, *Gilson, Trademark Dilution Now a Federal Wrong: An Analysis of the Federal Trademark Dilution Act of 1995 (1996),* pgs. 3–5 for a brief

overview of the history of dilution statutes from which much of the Court's discussion of the history is taken.

lic." *Id.* at 818. Schechter rejected the theory that the exclusive role of a trademark was to serve as a source identifier. He argued that the true function of a mark is to identify a product as satisfactory and thereby stimulate further purchases by the consuming public. He argued that injury occurs to a trademark owner whenever a trademark is used by another, even when used on non-competing goods. He explained that an injury to the trademark owner occurs when there is "a gradual whittling away or dispersion of the identity and hold upon the public mind of the mark or name by its use upon non-competing goods. The more distinctive or unique the mark, the deeper is its impress upon the public consciousness, and the greater is its need for protection against vitiation or dissociation from the particular product in connection with which it has been used." *Id.* at 825. This argument that the trademark laws should protect owners in connection with non-competing goods was novel. Attempts to enact a federal dilution statute in 1932 were unsuccessful. See, *Gilson,* at p. 3.

Massachusetts became the first state to adopt a trademark dilution law in 1947. Since then, over twenty other states have followed suit. In addition, at least three states, Michigan, New Jersey and Ohio recognize dilution as a common law cause of action. Section 12 of the Model State Trademark Act contains the following dilution provision:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this Act, or a mark valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Model State Trademark Bill, § 12 (USTA 1964). A trademark dilution provision is also contained in Section 25 of the Restatement (Third) of Unfair Competition.

### B. The Trademark Dilution Act of 1995.[6]

The serious push for a federal trademark dilution law began in 1987 with the publica-

tion of "The United States Trademark Association Review Commission Report and Recommendations to USTA President and Board of Directors." In that report, the Commission proposed the adoption of a new federal trademark dilution law. Trademark dilution provisions were included in S. 1883, the proposed Trademark Law Revision Act of 1987. However, while most of the bill's provisions eventually became law, concerns—raised by the broadcast industry and rallied by Rep. Robert Kastenmeier (D.Wis.)—that dilution protection would impinge on the First Amendment resulted in the deletion of the dilution provisions from the final legislation.

In 1991, the United States Trademark Association (USTA) Board of Directors adopted a resolution supporting a federal trademark dilution provision. The American Bar Association Patent, Trademark and Copyright Law Section, in its 1991–92 Annual Report, voted overwhelmingly in favor of adding a dilution section to the Lanham Act.

On March 22, 1995, the Federal Trademark Dilution Act of 1995 was introduced in the House of Representatives as H.R. 1295. With changes largely designed to make the bill applicable to the owners of both federally registered and common law trademarks, the bill was signed into law on January 16, 1996 as Public Law 104–98, creating a new Section 43(c) to the Lanham Act.

### C. Analysis of the Act.

Section 43(c) of the Lanham Act, also known as the Federal Trademark Dilution Act of 1995 ("Act") became effective on January 16, 1996. A copy of the Act is attached as Appendix A. The new law benefits only "famous" trademarks. The "federal dilution statute is necessary because famous marks ordinarily are used on a nationwide basis and dilution protection is currently only available on a patch-quilt system of protection, in that only approximately 25 states have laws that prohibit trademark dilution." H.R.Rep. No. 374, 104th Cong., 1st Sess.1995, 1195 WL 709280, pg. 4 (Leg.Hist.) The Federal Trademark Dilution Act provides that:

---

6. See, Robert V. Petershack, *1995 Federal Trademark Dilution Act,* 69 JUL Wis. Law. 18, for discussion of evolution of the Act from which this section is taken.

the owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, ... 15 U.S.C. 1125(c) [7].

In order to state a cause of action under the Act a party must show that the mark is famous and that the complainant's use is commercial and in commerce which is likely to cause dilution. The statute defines the term "dilution" to mean "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127. "The definition is designed to encompass all forms of dilution recognized by the courts, including dilution by blurring, by tarnishment and disparagement, and by diminishment. In an effort to clarify the law on the subject, the definition also recognizes that a cause of action for dilution may exist whether or not the parties market the same or related goods or whether or not a likelihood of confusion exists. Thus, a mark protected against dilution can have acquired its fame in connection with one type of good or service and, as a result, be so famous as to be entitled to protection against dilution when used on or in connection with an unrelated good or service." H.R.Rep. No. 374, 104th Cong., 1st Sess.1995, 1995 WL 709280, pg. 3 (Leg. Hist.).

Under the Act, the owner of a famous mark is only entitled to injunctive relief unless the person against whom the injunction is sought willfully intended to trade on the owner's reputation or to cause dilution of the

famous mark. The Act does not preempt state dilution claims. The Act specifically provides that noncommercial use of the mark is not actionable. 15 U.S.C. § 1125(c)(4)(B).

The legislative history of the Act indicates that it was intended to address Internet domain name issues. Senator Patrick J. Leahy (D–Vt.), in discussing the Act stated:

> ... it is my hope that this anti-dilution statute can help stem the use of deceptive Internet addresses taken by those who are choosing marks that are associated with the products and reputations of others.

Remarks of Senator Leahy in the United States Senate, December 29, 1995, Cong. Rec. S. 19312 (104th Cong.1995).

**D. Existing Case Law.**

Very few courts have addressed the issue of registering trademarks as domain names under the Federal Trademark Dilution Act. This court in *ActMedia, Inc. v. Active Media Int'l Inc.*, 1996 WL 466527 (N.D.Ill.1996) held that defendant's reservation of the domain name "actmedia.com" without the authorization of the plaintiff, who had done business under Actmedia since 1972 and had registered the mark in 1986, violated the Lanham Act and the Illinois Anti–Dilution Act. The court held that the reservation of the domain name without authorization violated 15 U.S.C. § 1125 and Illinois common law because the action "(a) constitutes unauthorized use and misappropriation of Plaintiff's mark; (b) constitutes false designation of origin; (c) is likely to cause confusion in the marketplace that Plaintiff and Defendant are affiliated; and (d) is likely to cause confusion that Plaintiff sponsors or approves Defendant's commercial activities." *Id.* at 2. The court further held that defendant's actions violate the Illinois Anti–Dilution Act, Ill.Rev.Stat. ch. 140 § 22, because "it creates a likelihood of dilution of the distinctive qual-

---

7. Factors considered in determining the distinctiveness and fame of the mark are:
   a) degree of inherent or acquired distinctiveness of the mark;
   b) duration and extent of use of the mark;
   c) duration and extent of advertising and publicity of the mark;
   d) geographical extent of the trading area in which the mark is used;

   e) channels of trade for the goods or services;
   f) degree of recognition of the mark in the trading area;
   g) use of the same or similar marks by third parties; and
   h) whether the mark was federally registered.
   15 U.S.C. § 1125(c)(1)(A)-(H).

ity of the Mark." *Id.* The court entered a permanent injunction requiring Defendant to transfer the domain name to plaintiff.

In *Hasbro, Inc. v. Internet Entertainment Group, Ltd.,* 1996 WL 84853 (W.D.Wash.), the court preliminarily enjoined defendant's use of the domain name "candyland.com" to identify a sexually explicit Internet site. The court held that "Hasbro has demonstrated a likelihood of prevailing on its claims that defendant's conduct violates the federal trademark anti-dilution statute, 15 U.S.C. § 1125(c) and the Washington State trademark anti-dilution statute, RCW 19.77.160." *Id.* at 1.

### E. The Dilution Statutes Have Been Violated by Toeppen.

#### 1. Intermatic Is a Famous Mark.

■ As a matter of law the Court finds that the Intermatic mark is famous within the meaning of 15 U.S.C. § 1125(c). Toeppen does not dispute that the Intermatic mark is famous and no evidence has been presented to contradict Intermatic's long history and use of its mark. The Intermatic mark is a strong fanciful federally registered mark, which has been exclusively used by Intermatic for over 50 years. Therefore since Intermatic has established that its mark is famous, it need only show that Toeppen's use is a commercial use in commerce and that by his use dilution will likely occur.

#### 2. Toeppen Is Engaged In a Commercial Use of the Intermatic Trademark.

■ Toeppen argues that there has been no violation of the Federal Trademark Dilution Act because his use of the Intermatic mark is not a commercial use. Intermatic asserts that Toeppen's use is commercial because the Internet designation ".com" is short for commercial and Toeppen used "intermatic.com" in connection with the sale of a computer software program.

■ The use of the first level domain designation ".com" does not in and of itself constitute a commercial use. The Internet is constantly changing and evolving. Currently the ".com" designation is the only one available for both commercial and private use. In the future perhaps other first level domain designations will be available solely for private or commercial uses. However, the Court is not here to set policy guidelines for the Internet, but rather the Court must apply the law to the Internet as it exists today. Therefore, the Court holds that the ".com" designation alone does not establish commercial use.

■ Intermatic also argues that Toeppen's use of the "intermatic.com" domain name in connection with the proposed sale of a computer software program constitutes a commercial use. Toeppen's use ended before the effective date of the Federal Trademark Dilution Act. Toeppen's use of "intermatic.com" in connection with the software program does not constitute a commercial use because this particular commercial use terminated prior to the passage of the Act.

Toeppen's intention to arbitrage the "intermatic.com" domain name constitutes a commercial use. At oral argument Toeppen's counsel candidly conceded that one of Toeppen's intended uses for registering the Intermatic mark was to eventually sell it back to Intermatic or to some other party. Toeppen's desire to resell the domain name is sufficient to meet the "commercial use" requirement of the Lanham Act.

#### 3. Toeppen's Use of the Internet Constitutes Commerce.

■ Toeppen's use of the Internet satisfies the "in commerce" requirement of Section 43(c). Toeppen also argues that he has not violated the Act because his use of the "intermatic.com" domain name was not in commerce. This argument misses the mark. "Because Internet communications transmit instantaneously on a worldwide basis there is little question that the 'in commerce' requirement would be met in a typical Internet message, be it trademark infringement or false advertising." 1 Gilson, *Trademark Protection and Practice,* § 5.11[2], p. 5–234 (1996). The Supreme Court has held that the in commerce requirement should be construed liberally because the Lanham Act "confers broad jurisdictional powers upon the

courts of the United States." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 283, 73 S.Ct. 252, 254, 97 L.Ed. 319 (1952). Therefore the Court finds that use of the Internet is sufficient to meet the "in commerce" requirement of the Act.

### 4. Toeppen Is Causing Dilution of the Distinctive Quality of the Mark.

Toeppen's use of "intermatic.com" is likely to cause dilution of its mark. For purposes of the Act, the "term 'dilution' means the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127. Toeppen's conduct has caused dilution in at least two respects. First, Toeppen's registration of the intermatic.com domain name lessens the capacity of Intermatic to identify and distinguish its goods and services by means of the Internet. Intermatic is not currently free to use its mark as its domain name. This is not a situation where there were competing users of the same name by competing parties and a race to the Internet between them. This case involves one party, Intermatic, with a long history of trademark use, and a second, Toeppen, who has effectively enjoined Intermatic from using its trademark by the payment of $100 to register the "intermatic.com" domain name. This activity clearly violates the Congressional intent of encouraging the registration and development of trademarks to assist the public in differentiating products. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985). It would seriously undermine the trademark policy to prevent a company from exercising its mark by reason of Toeppen's conduct. Such conduct lessens the capacity of Intermatic to identify its goods to potential consumers who would expect to locate Intermatic on the Internet through the "intermatic.com" domain name.

Second, Toeppen's conduct dilutes the Intermatic mark by using the Intermatic name on its web page. As the Seventh Circuit explained in *Polaroid Corp. v. Polaraid, Inc.*, 319 F.2d 830, 836 (7th Cir.1963),

> The gravamen of a dilution complaint is that the continuous use of a mark similar to plaintiff's works an inexorably adverse effect upon the distinctiveness of the plaintiff's mark, and that, if he is powerless to prevent such use, his mark will lose its distinctiveness entirely ... dilution is an infection which, if allowed to spread, will inevitably destroy the advertising value of the mark.

"The harm caused by dilution is, for example, that the distinctiveness of the name [Intermatic] and the favorable association that accrued to it by virtue of [Intermatic's] commercial success would be undermined by the use of similar names in connection with other non-competing and non-confusing products." *Ringling Bros.-Barnum & Bailey Combined Shows, Inc., v. Celozzi–Ettelson Chevrolet, Inc.*, 855 F.2d 480, 485 (7th Cir.1988). If Toeppen were allowed to use "intermatic.com", Intermatic's name and reputation would be at Toeppen's mercy and could be associated with an unimaginable amount of messages on Toeppen's web page. "It is the same dissonance that would be produced by selling cat food under the name 'Romanoff,' or baby carriages under the name 'Aston Martin'" *Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 550 (7th Cir.1983).

Dilution of Intermatic's mark is likely to occur because the domain name appears on the web page and is included on every page that is printed from the web page. At oral argument counsel agreed that almost all web pages will include the domain name on the computer screen as well as printing the name on any and all pages that are printed. The all inclusive nature of the domain name all but guarantees that "intermatic.com" will appear on the web page and any printouts. Attaching Intermatic's name to a myriad of possible messages, even something as innocuous as a map of Urbana, Illinois, is something that the Act does not permit. "[T]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods." *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018,

1026 (7th Cir.1979). The fact that "intermatic.com" will be displayed on every aspect of the web page is sufficient to show that Intermatic's mark will likely be diluted.

### F. Illinois Anti–Dilution Act.

The Illinois Anti–Dilution Act permits the owner of a mark to obtain an injunction enjoining the use by another of a similar mark "if there exists a likelihood ... of dilution of the distinctive quality of the mark, ... notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services." 765 ILCS 1035/1 et. seq. Under the Illinois Act, "an injunction must be granted if the prior user can show that the mark is distinctive and that the subsequent user's use dilutes that distinctiveness." *Hyatt Corp. v. Hyatt Legal Services,* 736 F.2d 1153, 1157 (7th Cir.1984), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361.

### VI. RELIEF

Both the Lanham Act and the Illinois Anti–Dilution Act provide for injunctive relief upon a finding that a mark will likely be diluted. However, as mentioned earlier the federal trademark dilution act provides for additional relief upon a finding of willfulness. Such a finding cannot be made on this record in the context of summary judgment because a fact question exists. See e.g., *Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.,* 955 F.2d 1143 (7th Cir.1992) (reversing and vacating the denial of attorney's fees in Lanham Act case for factual determination of whether "exceptional circumstances" or "extenuating circumstances" exist). Therefore it appears that the only relief plaintiff is entitled to at this time is injunctive relief. The appropriate relief in this case is to restrain Toeppen from preventing Intermatic from obtaining "intermatic.com" domain name designation and to require Toeppen to discontinue any and all use of the Intermatic mark.

### VII. CONCLUSION

For the foregoing reasons, **the court recommends that Intermatic's motion for summary judgment should be GRANTED** in part and denied in part as to counts III and IV, Intermatic's motion for summary judgment should be DENIED as to counts I, II, V, VI, and VII, and Toeppen's motion for summary judgment should be DENIED as to all counts.

Intermatic should be granted the following relief:

1) Pursuant to 15 U.S.C. § 1125(c) and the Illinois Anti–Dilution Act, Toeppen, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this final judgment and permanent injunction are hereby permanently enjoined from using or infringing in any matter Intermatic's registered trademark, "INTERMATIC";

2) Pursuant to 15 U.S.C. § 1125(c) and the Illinois Anti–Dilution Act Toeppen, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this final judgment and permanent injunction are hereby permanently enjoined from taking any action to prevent Intermatic from obtaining the Internet domain name, "intermatic.com", and are permanently enjoined from asserting any further interest in "intermatic.com" domain name; and

3) The Court reserves jurisdiction to enforce the terms of this Injunction.

Date: October 3, 1996.

### APPENDIX A

**The Text of the Federal Trademark Dilution Act of 1995. H.R. 1295**

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

**Section 1. Short Title.**

This act may be cited as the "Federal Trademark Dilution Act of 1995".

**Section 2. Reference to the Trademark Act of 1946.**

For the purpose of this Act, the Act entitled "An Act to provide for the registration and protection of trade-marks used in commerce, to carry out the provisions of certain international conventions, and for

other purposes", approved July 5, 1946 (15 U.S.C. 1051 and following), shall be referred to as the "Trademark Act of 1946".

## Section 3. Remedies for Dilution of Famous Marks.

(a) Remedies.—Section 43 of the Trademark Act of 1946 [15 U.S.C. 1125] is amended by adding at the end the following new subsection:

"(c)(1) The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection. In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to—

"(A) the degree of inherent or acquired distinctiveness of the mark;

"(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

"(C) the duration and extent of advertising and publicity of the mark;

"(D) the geographical extent of the trading area in which the mark is used;

"(E) the channels of trade for the goods and services with which the mark is used;

"(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

"(G) the nature and extent of use of the same or similar marks by third parties; and

"(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principle register.

"(2) In an action brought under this subsection, the owner of the famous mark shall be entitled only to injunctive relief unless the person against whom the injunction is sought willfully intended to trade on the owner's reputation or to cause dilution of the famous mark. If such willful intent is proven, the owner of the famous mark shall also be entitled to the remedies set forth in sections 35(a) and 36, subject to the discretion of the court and the principles of equity.

"(3) The ownership by a person of a valid registration under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principle register shall be a complete bar to an action against that person, with respect to that mark, that is brought by another person under the common law or a statute of a State and that seeks to prevent dilution of the distinctiveness of a mark, label, or form of advertisement.

"(4) The following shall not be actionable under this section:

"(A) Fair use of a famous mark by another person in comparative commercial advertising or promotion to identify the competing goods or services of the owner of the famous mark.

"(B) Noncommercial use of a mark.

"(C) All forms of news reporting and news commentary.".

(b) CONFORMING AMENDMENT.— The heading for title VIII of the Trademark Act of 1946 is amended by striking "AND FALSE DESCRIPTIONS" and inserting "FALSE DESCRIPTIONS, AND DILUTION".

## Section 4. Definition.

Section 45 of the Trademark Act of 1946 (15 U.S.C. 1127) is amended by inserting after the paragraph defining when a mark shall be deemed to be "abandoned" the following:

"The term 'dilution' means the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—

"(1) competition between the owner of the famous mark and other parties, or

"(2) likelihood of confusion, mistake, or deception."

**Section 5.    Effective Date.**

This Act and the amendments made by this Act shall take effect on the date of the enactment of this Act.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the Magistrate Judge's Report and Recommendation.    See  Fed.R.Civ.P.  72(b);    28 U.S.C. 636(b)(1)(B);  *Lorentzen v. Anderson Pest Control,* 64 F.3d 327, 329 (7th Cir.1995); *The Provident Bank v. Manor Steel Corp.,* 882 F.2d 258 (7th Cir.1989).