**FORD MOTOR COMPANY,**
et al., Plaintiffs,

v.

**GREATDOMAINS.COM, INC.,**
et al., Defendants.

No. 00–CV–71544–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 20, 2001.

Kathleen Lang, John E. S. Scott, Dickinson Wright, Detroit, MI, for Plaintiffs.

Susan N. McFee, Ford Global Technologies, Inc., Dearborn, MI, Gregory Phillips, Howard, Phillips & Anderson, Salt Lake City, UT, Luis Acosta, Plunkett & Cooney, Bloomfield Hills, MI, Shelly Liberto, Santa Anna, CA, Khalida Farooqui, Savannah, GA, Robert Yoder, Phoenix, AZ, William A. Sankbell, Kerr, Russell, Detroit, MI, Lisa S. Gallerano, Akin, Gump, Strauss, Hauer & Feld, Dallas, TX, Thomas Pezzenti, Jr., Smith & Johnson, Traverse City, MI, Richard Phillips, Mikkelborg, Broz,

Seattle, WA, Cindy Cohn, 454 Electronic Frontier Foundation, San Francisco, CA, Susanne Singleton, Lakewood, CO, Roberta Jacobs–Meadway, Panitch, Schwarze, Philadelphia, PA, Stephen Mahan, Norris, TN, David H. Lowenschuss, Ann Arbor, MI, Eric C. Grimm, Cyberbri, PLC, Ann Arbor, MI, for Defendants.

## ORDER GRANTING DEFENDANT GREATDOMAINS.COM, INC.'S RULE 12(B)(6) MOTION TO DISMISS AND GRANTING IN PART, DENYING IN PART THE EFF DEFENDANTS' RULE 12(B)(6) MOTIONS TO DISMISS

CLELAND, District Judge.

Currently pending before the court are motions by Defendants Robert Emmert; Paul Brown; Alfonso Fiero; John Hall;[1] Radtech; and Tom Cooper (collectively "the EFF Defendants")[2] and GreatDomains.com, Inc. ("Great Domains") to dismiss this case under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. For the reasons set forth below, the court will grant Great Domains's motion and dismiss Great Domains from this case. The EFF Defendants' motions will be granted in part and denied in part.

### I. BACKGROUND

Great Domains operates a website on the Internet at "www.greatdomains.com", an auction site that operates in a manner similar to the well-known "ebay.com". Rather than offering a forum for whatever objects cyber-merchants might wish to

---

**1.** Defendant Gapmount Ltd. is the listed registrant of the domain name "jaguarcenter.com"; John Hall is the listed billing contact; both are named as defendants. Because the pertinent motion to dismiss is filed with reference to John Hall, the court will refer to both defendants under that name.

**2.** EFF refers to the Electronic Frontier Foundation, which is assisting the defense of the listed individual defendants. The EFF Defendants account for only seven of more than eighty defendants in this case.

sell, however, Great Domains specializes in auctioning Internet domain names. Thus, persons who have obtained rights to use a particular domain name by paying what is a relatively insignificant registration fee can sell those rights to a willing purchaser at market price through the "greatdomains.com" website.

In addition to providing a marketplace for buyers and sellers of domain names, Great Domains furnishes a number of ancillary services, including domain name appraising. Great Domains also will extend offers to domain name registrants on behalf of persons interested in purchasing domains that have not been posted for sale. In exchange for these and other services, Great Domains receives a fixed percentage of the price of any domains sold over its website.

Plaintiffs Ford Motor Company; Jaguar Cars, Ltd.; Aston Martin Lagonda, Ltd.; and Volvo Trademark Holding (collectively "Ford") commenced this lawsuit against Great Domains and the EFF Defendants, alleging that numerous domain names registered to the EFF Defendants and offered for sale at "greatdomains.com" infringe Ford trademarks. Ford thus asserts that Great Domains and the EFF Defendants are liable for (1) trademark cyberpiracy under the 1999 Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d); (2) trademark infringement pursuant to the Lanham Act § 32, 15 U.S.C. § 1114; (3) unfair competition, Lanham Act § 43(a), 15 U.S.C. § 1125(a); and trademark dilution, under the Federal Trademark Dilution Act of 1995 ("FTDA"), 15 U.S.C. § 1125(c). Great Domains and each of the EFF Defendants have filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).

## II. STANDARD

In ruling on a Rule 12(b)(6) motion to dismiss, the court must construe the complaint in a light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *See Sistrunk v. City of Strongsville,* 99 F.3d 194, 197 (6th Cir. 1996). When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. *See Columbia Natural Resources, Inc. v. Tatum,* 58 F.3d 1101, 1109 (6th Cir.1995). Hence, a judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations. *Wright v. Metro-Health Med. Ctr.,* 58 F.3d 1130, 1138 (6th Cir.1995).

Though decidedly liberal, this standard of review requires more than the bare assertion of legal conclusions. *See Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 726 (6th Cir.1996). Thus, the complaint must (1) give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests, *see Gazette v. City of Pontiac,* 41 F.3d 1061, 1064 (6th Cir.1994), and (2) "contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory," *Lillard,* 76 F.3d at 726 (emphasis in original) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir. 1988)).

## III. DISCUSSION

In addressing the Defendants' Rule 12(b)(6) motions, the court concludes that all claims must be dismissed, except the cybersquatting claims brought pursuant to the ACPA against the EFF Defendants.

## A. Cybersquatting

The Anticybersquatting Consumer Protection Act provides, in relevant part, as follows:

A person shall be liable in a civil action by the owner of a mark ... if, without regard to the goods or services of the parties, that person

(i) has a bad faith intent to profit from that mark ...; and

(ii) registers, traffics in, or uses a domain name that-

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark[.]

15 U.S.C. § 1125(d)(1)(A). Ford has alleged facts sufficient to sustain a claim of cybersquatting against each of the EFF Defendants. With regard to Great Domains, however, Ford has failed to allege that Great Domains directly transferred or received a property interest in a domain name, as is required under the ACPA. Accordingly, the cybersquatting claim against Great Domains must be dismissed.

### 1. EFF Defendants

■ To survive a Rule 12(b)(6) motion for failure to state a claim under the ACPA, a plaintiff must allege facts in support of the following three elements:

(1) that the defendant has registered, trafficked in, or used a domain name;

(2) that the domain name is identical or confusingly similar to, or dilutive of, a distinctive or famous trademark; and

(3) that the defendant has bad faith intent to profit from the mark.

15 U.S.C. § 1125(d).

### (a) "Registered, trafficked in, or used"

With regard to the first element, the complaint asserts that each of the EFF Defendants is the registrant of at least one domain name that incorporates a Ford mark. Indeed, the EFF Defendants individually have conceded this point. (See EFF Defs.' Affs. ¶ 3). Ford thus has alleged facts sufficient to satisfy this requirement.

### (b) "Identical or confusingly similar"

■■ The court similarly concludes that Ford has alleged facts sufficient to support its allegation that the domain names are "identical or confusingly similar to" a distinctive Ford mark. Each of the disputed domain names—"4fordparts.com", "4fordtrucks .com", "lincolntrucks.com", "jaguarcenter.com", "jaguarenthusiastsclub.com", "vintagevolvos.com", and "volvoguy .com"—incorporates either the FORD, LINCOLN, JAGUAR, or VOLVO mark. Courts generally have held that a domain name that incorporates a trademark is "confusingly similar to" that mark if "consumers might think that [the domain is] used, approved, or permitted" by the mark holder. *Harrods Ltd. v. Sixty Internet Domain Names*, 157 F.Supp.2d 658, 677 (E.D.Va.2001). Thus, courts consistently have found that "slight differences between domain names and registered marks, such as the addition of minor or generic words to the disputed domain names are irrelevant." *Victoria's Cyber Secret Ltd. Partnership v. V Secret Catalogue, Inc.*, 161 F.Supp.2d 1339, 1351 (S.D.Fla.2001); *See also PACCAR, Inc. v. Telescan Techs., L.L.C.*, 115 F.Supp.2d 772, 777 (E.D.Mich.2000) (granting holder of PETERBILT mark injunction against defendant's use of "peterbilttrucks.com",

"peterbiltnewtrucks.com", "peterbiltused-trucks.com", "peterbiltdealers.com", and "peterbilttruckdealers.com"). This court similarly concludes that, unless words or letters added to the plaintiff's mark within the domain name clearly distinguish it from the plaintiff's usage,[3] allegations that a domain name incorporates a protected mark generally will suffice to satisfy the "identical or confusingly similar to" requirement. Because the marks incorporated into the domain names at issue in this case cannot conclusively be distinguished from the Ford marks, the court determines that Ford has alleged facts with regard to the second element sufficient to overcome the EFF Defendants' Rule 12(b)(6) motions.

### (c) "Bad faith intent to profit"

The issues are less straightforward with regard to the third element: "bad faith intent to profit from the mark." In the ACPA, Congress provided a non-exhaustive list of factors to consider in determining whether a domain name registrant has acted with "bad faith intent to profit." Specifically, the statute directs courts to consider whether the defendant (1) has trademark rights in the domain name that are concurrent with the plaintiff's; (2) is identified by the domain name; (3) has previously used the domain name in connection with goods or services; (4) has engaged in noncommercial or fair use of the mark on the Internet; (5) intends to divert customers away from the mark owner; (6) has offered to sell the domain name before using it for a legitimate purpose; (7) provided misleading contact information when registering the domain name; or (8) has registered multiple domain names

that are confusingly similar to others' trademarks. 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(VIII). The statute also invites consideration of the extent to which the incorporated mark is distinctive and famous. *Id.* at (IX).

■ These factors, as a whole, focus on whether the defendant's use of the disputed domain name is legitimate—*i.e.*, for some purpose other than simply to profit from the value of the trademark. This indicates that the ACPA was designed to target persons who commandeer a domain name for no reason other than to profit by extortion, yet bypass persons with legitimate interests in the domain name—even if they do incidentally profit from the domain name's status as a trademark. The ACPA's legislative history reinforces that this is the purpose of the Act.

For example, in discussing the fourth "bad faith factor"—*i.e.*, the defendant's "bona fide noncommercial or fair use of the mark in a site accessible under the domain name"—the Senate and House Reports state that "[u]nder the bill, the use of a domain name for purposes of comparative advertising, comment, criticism, parody, news reporting, etc., *even where done for profit*, would not alone satisfy the bad-faith intent requirement." S.Rep. No. 106–140, at 14 (1999), *published at* 1999 WL 594571; H.R. Rep. 106–412, at 11 (1999), *published at* 1999 WL 970519 (emphasis added). *Cf. New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302 (9th Cir.1992) (upholding against dilution claim a newspaper's use of the NEW KIDS ON THE BLOCK mark in a profit-making poll re-

---

**3.** For example, the domain name "fordstheatre.org"—the homepage of the renowned Ford's Theatre in Washington, D.C.—incorporates the FORD mark with the addition of the generic word "theatre" but, from its context,

is not "confusingly similar to" the FORD mark. No reasonable person could conclude that such a site was "used or approved" by the Ford Motor Company.

garding which band member was most popular).

Further, the Report "instructs that the sixth "bad faith" factor—*i.e.,* whether the defendant has offered to transfer the domain name to the mark owner for financial gain without having used the domain name in the bona fide offering of goods or services"—

> does not suggest that a court should consider the mere offer to sell a domain name to a mark owner or the failure to use a name in the bona fide offering of goods or services is [sic: as] sufficient to indicate bad faith. Indeed, there are cases in which a person registers a name in anticipation of a business venture that simply never pans out. And someone who has a legitimate registration of a domain name that mirrors someone else's domain name, such as a trademark owner that is a lawful concurrent user of that name with another trademark owner, may, in fact, wish to sell that name to the other trademark owner.

S.Rep. No. 106–140, at 15; H.R. Rep. 106–412, at 12. *Cf. HQM, Ltd. v. Hatfield,* 71 F.Supp.2d 500 (D.Md.1999) (upholding registration of "hatfield.com" by person with last name Hatfield against infringement, unfair competition, and dilution claims brought by owner of HATFIELD mark).

■ These statements from the congressional record demonstrate that Congress sought to prevent the ACPA from being trolled as dragnet, catching every small-fry Internet user whose domain name happens—in some small degree—to correspond with a protected trademark. According to the EFF Defendants, however, that is exactly what Ford has done in this lawsuit, naming as a defendant every seller listed at "greatdomains.com" whose domain name incorporates a Ford mark. Moreover, the EFF Defendants note that Ford has aimed no specific allegations against any of them individually, asserting no more than that each is the registrant of a domain name that (1) incorporates a Ford trademark and (2) has been offered for sale over the Internet.

■ Ford responds to these accusations noting that increasingly sophisticated tactics of cybersquatters make it difficult, at best, to determine whether a domain name was registered in bad faith. Where early cybersquatters were bold in directly seeking to extort money from trademark holders, *see, e.g., Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316 (9th Cir.1998), the modern breed frequently is willing to simply register and "warehouse"[4] a domain name, knowing that the trademark holder, or some other third-party with a legitimate use for the mark, is bound to "come knocking."

■ While the court finds merit in both parties' positions, the ACPA clearly is intended to address concerns such as those set forth by Ford. Because defendants easily can conjure up a "legitimate" use for a domain name that incorporates a trademark, plaintiffs frequently will find it difficult, if not impossible, to obtain evidence probative of "bad faith intent" without court sanctioned discovery. Indeed, obtaining information relevant to almost all of the bad faith factors set forth in the statute requires direct testimony from the defendant. Accordingly, the court concludes that, at least where facts showing a *prima facie* case of "intent to profit" have been alleged, the element of bad faith generally will not come into play until the summary judgment stage. Thus, the les-

---

**4.** "Warehousing" refers to the act of registering, but neither using nor attempting too sell, a domain name.

son of the ACPA is that registrants of domain names that incorporate a protected trademark who no longer have a legitimate use for the domain name must, in most cases, let their registration lapse, rather than offer it for sale, if they hope to completely avoid the burden of litigating through at least the summary judgment stage. Insofar as Ford has set forth facts, which, if proven, would demonstrate that each of the EFF Defendants has offered to sell a domain name that incorporates a Ford mark over the Internet, the court concludes that a *prima facie* case of "bad faith intent to profit" has been made out with regard to each of the EFF Defendants.

■ Defendant John Hall has stated in affidavit that "I have never registered the <jaguarcenter.com> domain for sale at Great Domains or anywhere else. It is not for sale." (Hall Aff. at 8, attached to Hall's "Motion to Dismiss.") Moreover, he explains that he registered the "jaguarcenter.com" domain to assist a friend's daughter, who had done research about jaguars cats and wanted to publicize issues concerning their preservation. (*Id.*) His claims are supported by a reasonably well-developed website dedicated to jaguar cats and located at "jaguarcenter.com". Although Defendant Hall alleges that he has done no more than register a domain name—thus not even evincing an "intent to profit"—at the 12(b)(6) stage, all reasonable inferences must be drawn in the plaintiff's favor. That the "jaguarcenter.com" domain was posted for sale through Great Domains is sufficient to let this case proceed to discovery. Accordingly, it is unnecessary for the court to determine what additional facts would be necessary to overcome a Rule 12(b)(6) motion if the complaint alleged no more than that a defendant had registered a trademark as a domain name.

## 2. Great Domains

The issue with regard to Great Domains is whether Ford has sufficiently alleged the first necessary element of a cybersquatting claim, *i.e.*, whether Great Domains either (1) "registers," (2) "traffics in," or (3) "uses" the domain names at issue in this case. 15 U.S.C. § 1125(d)(1)(A)(ii). It is undisputed that Great Domains has not "register[ed]" any of the challenged domain names. Moreover, § 1125(d) expressly provides that a person may not be held liable for "using" a domain name under the statute unless that person "is the domain name registrant or that registrant's authorized licensee." § 1125(d)(1)(D). Thus, the court's inquiry must focus on whether Ford can demonstrate that Great Domains has "traffic[ked] in" a domain name. 15 U.S.C. § 1125(d)(1)(A)(ii).

■ The phrase "traffics in" is defined in the ACPA as "refer[ring] to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration." 15 U.S.C. § 1125(d)(1)(E). The specific terms listed in this definition are susceptible to broad interpretation and, moreover, are merely illustrative. Nonetheless, the concluding catch-all phrase "any other transfer ... or receipt in exchange for consideration" provides the context in which they must be understood. Specifically, the language "any other transfer ... or receipt" clarifies that the defining terms are all ways in which a domain name may be transferred or received. The key words—"transfer" and "receipt"—both denote some level of ownership or control passing between the person transferring and the person receiv-

ing.[5] Thus relying upon the plain meaning of the statute, the court concludes that the phrase "traffics in" contemplates a direct transfer or receipt of ownership interest in a domain name to or from the defendant.

■ Great Domains's commercial activity does not fit within this definition. As an auctioneer, Great Domains does not transfer or receive for consideration the domain names that are sold over its website. Although it does provide a forum at which such transfers and receipts may take place, the property interests associated with each domain name remain with the person "transferring" and pass directly to the person "receiving," thus bypassing Great Domains entirely. Accordingly, the court concludes that the ACPA does not cover Great Domain's provision of ancillary services, which merely facilitate the statutorily targeted transfers and receipts. *Accord Bird v. Parsons,* 127 F.Supp.2d 885 (S.D.Ohio 2000) ("Registration of a domain name does not constitute use within the trademark laws. The same logic applies to providing a site at which domain names can be sold." (internal citation omitted)); *cf. Lockheed Martin Corp. v. Network Solutions, Inc.,* 141 F.Supp.2d 648, 655 (N.D.Tex.2001) (finding "no summary judgment evidence that [a domain name registrar] ha[d] engaged in transactions of any of those kinds" listed to define the phrase "traffics in").

■ In addition to the plain language of the statute, the ACPA's "bad faith intent" requirement lends further support to the conclusion that only persons directly transferring or receiving a property interest in the domain name can be liable as cybersquatters. First, as discussed previously, the bad faith factors set forth in the ACPA focus on the relationship between the domain name and the defendant, directing attention to the legitimacy of the defendants' use. Such an analysis is not purposeful when applied to a person or entity that did not register the domain name, has no ownership interest in the domain name, and does not otherwise use the domain name. *Cf. Lockheed,* 141 F.Supp.2d at 655 ("Although the list is not exclusive, none of the conditions and conduct listed would be applicable to a person functioning solely as a registrar or registry of domain names."). The court believes that if Congress had intended to extend the anticybersquatting law to auction, banking, or other similar auxiliary service providers, it would have set forth factors that meaningfully could be applied in determining whether such entities had acted in bad faith.

Second, subjecting ancillary service providers such as Great Domains to liability under the statute would significantly hinder the case-by-case analysis intended in "balanc[ing] the property interests of trademark owners with the legitimate interests of Internet users and others who seek to make lawful uses of others' marks." S.Rep. No. 106–140, at 13; H.R.Rep. No. 106–412, at 10. Great Domains has little ability to ascertain whether a domain name seller wishes to sell based on a "bad faith intent to profit" or because some previous legitimate use has proven unsuccessful or undesirable. This is particularly true where, as here, a domain name incorporates another's trademark, but is not identical to that trademark. In such circumstances, a defendant easily can set forth a facially legitimate reason for having registered the disputed

---

**5.** A transfer is "the conveyance of right, title, or interest in either real or personal property from one person to another by sale, gift, or other process." Webster's Third New International Dictionary 2427 (1981). Similarly, "receipt" is "the act or process of receiving" something that has been transferred. *Id.* at 1894.

domain. The EFF Defendants' explanations for having registered domains such as "volvoguy.com" ("volvoguy" is registrant's nickname arising from his work as a Volvo repair specialist), "jaguarcenter.com" (site for publication of issues surrounding preservation of jaguar cats), "vintagevolvos.com" (site for vintage Volvo enthusiasts to connect with each other and share resources), and so forth, amply illustrate this point. For a court to determine whether such proffered uses are, in fact, legitimate requires legal analysis of whether the disputed domain is "confusingly similar to or dilutive of" a mark and the weighing of evidence, particularly each individual defendant's credibility. Imposing liability under the ACPA upon Great Domains would require it to engage in a similarly complex process, essentially forcing Great Domains to discontinue any trafficking in domain names that contain protected trademarks. Such a result would be contrary to Congress's intent not to hinder the legitimate buying and selling of domain names over the Internet. For these reasons, the court concludes that, in addition to the plain meaning of "traffics in," the bad faith element further mandates that the ACPA be limited in its application to persons directly transferring or receiving a property interest in the domain name at issue.

### 3. Contributory liability

 Ford argues that even if it cannot directly state a cybersquatting claim against Great Domains, the law supports a claim of contributory liability. This argument is premised on Ford's allegations that Great Domains (1) auctions domain names "to the highest bidder" through the "greatdomains.com" website (Compl.¶ 5); (2) "collects a commission on the sale of domain names purchased through its web site" and thus "shares its customers' interest in selling their domain names at the highest possible price" (Compl.¶ 108); and (3) encourages cybersquatting by explaining in the "valuation model" found on its website that "the value of a domain name is driven by its ability to deliver traffic and revenue," which ability, Ford adds, is greatly enhanced if the domain name incorporates a trademark. (Compl.¶ 112.) These claims are insufficient to support contributory liability in the cybersquatting context.

 It is well established that a third party can be held liable for another's infringement of a trademark if the third party (1) "intentionally induces another to infringe a trademark" or (2) "continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1148 (7th Cir.1992) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). While willful blindness is inexcusable under contributory infringement law, *id.* at 1149 (citing *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989)), there is "no affirmative duty to take precautions against the sale of counterfeits," *id.*

Courts in at least two cases have expanded this analysis to hold that a flea market that exercises "direct control and monitoring" over its vendors can be liable for contributory infringement if it "suppl[ied] the necessary marketplace" for the sale of infringing products. *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984–85 (9th Cir.1999) (citing *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir.1996) and *Hard Rock*, 955 F.2d at 1149). Ford argues that the "flea market" analysis ought to apply here, because Great Domains has provided "the necessary marketplace" for the EFF Defendants' alleged cybersquatting.

Although the "flea market" analysis generally has been applied in the infringement context, a similar standard arguably could be applied to allegations of cybersquatting. However, because the ACPA requires a showing of "bad faith intent"—a subjective element not required under traditional infringement, unfair competition, or dilution claims—the standard would be somewhat heightened. For example, it would be insufficient that an entity such as Great Domains were merely aware that domain names identical or similar to protected marks were being sold over its website. Rather, because legitimate uses of others marks are protected under the ACPA, a plaintiff would have to demonstrate that the "cyber-landlord" knew or should have known that its vendors had no legitimate reason for having registered the disputed domain names in the first place. Because an entity such as Great Domains generally could not be expected to ascertain the good or bad faith intent of its vendors, contributory liability would apply, if at all, in only exceptional circumstances. No such exceptional circumstances have been alleged in this case; thus, the claim for contributory liability against Great Domains cannot be maintained.

## B. Dilution, Infringement, and Unfair Competition

■ In addition to raising a claim under the ACPA, Ford's complaint seeks redress pursuant to claims of infringement, 15 U.S.C. § 1114, unfair competition, 15 U.S.C. § 1125(a), and dilution, 15 U.S.C. § 1125(c).[6] For the reasons set forth below, the court will dismiss these causes of action as against all Defendants.

A number of courts have adjudicated cybersquatting cases under traditional infringement and dilution standards. The analysis in those cases focuses on the "in connection with any goods or services" requirement for proving infringement, 15 U.S.C. §§ 1114 & 1125(a), and the "commercial use in commerce" requirement for proving dilution.

Infringement claims consistently have been dismissed by courts, regardless whether based on allegations of (1) mere registration, *see Lockheed Martin Corp. v. Network Solutions, Inc.,* 985 F.Supp. 949, 957 (C.D.Cal.1997) ("[S]omething more than the registration of the name is required before the use of a domain name is infringing."); (2) warehousing, *see Juno Online Servs., L.P. v. Juno Lighting, Inc.,* 979 F.Supp. 684, 691 (N.D.Ill.1997) ("The mere 'warehousing' of the domain name is not enough to find that defendant placed the mark on goods or … services as required."); or (3) actual trafficking, *see Intermatic Inc. v. Toeppen,* 947 F.Supp. 1227, 1235 (N.D.Ill.1996) (denying summary judgment on trademark holder's claim of domain name trafficking based, in part, on defendant's willingness not to use website "for the sale of any product or service"). Other courts similarly have emphasized the essential nature of an infringement claim's "in connection with goods or services" requirement. *See, e.g., Watts v. Network Solutions, Inc.,* 202 F.3d 276 (Table), 1999 WL 994012, at *2 (7th Cir. Oct. 26, 1999) (indicating that no infringement could occur where disputed domain name had never been used in connection with sale of goods or services).

---

**6.** Title 15 of the United States Code § 1125(a)—the "unfair competition" provision—provides the same protection to unregistered trademarks that the "infringement provision" of § 1114 provides to registered marks. Because the unfair competition and infringement elements are, in relevant part, identical, the court will refer to them collectively as "infringement."

In contrast, the success of dilution claims under the FTDA has varied, depending on whether mere registration or actual trafficking has been alleged. Courts overwhelmingly agree that mere registration is insufficient to support a claim of trademark dilution, just as it is inadequate to show infringement. *See, e.g., Panavision Int'l, L.P. v. Toeppen,* 945 F.Supp. 1296, 1303 (C.D.Cal.1996), *aff'd & quoted on appeal,* 141 F.3d 1316, 1324 (9th Cir.1998) ("Registration of a trade[mark] as a domain name, without more, is not a commercial use of the trademark and therefore is not within the prohibitions of the [FTDA]."); *Jews for Jesus v. Brodsky,* 993 F.Supp. 282, 307 (D.N.J.1998) ("[T]he mere registration of a domain name, without more, is not a 'commercial use' of a trademark."). Similarly, even activation of a domain name has, alone, been deemed insufficient. *Panavision,* 141 F.3d at 1324 (agreeing that defendant's "use of [another's] trademarks simply as his domain names cannot constitute a commercial use under the [FTDA]."); *HQM, Ltd.,* 71 F.Supp.2d at 507 (noting that "nearly every Court to have decided whether ... activation of a domain name constitutes 'commercial use' has rejected such arguments"). The consistent results between infringement and dilution claims, however, end where actual trafficking in domain names is alleged. Thus, courts have concluded that the "desire to resell the domain name," *Intermatic,* 947 F.Supp. at 1239, or "attempts to sell the trademarks themselves," *Panavision,* 141 F.3d at 1325, are enough to meet the FTDA's "commercial use" requirement.

▆▆▆ That domain name trafficking more readily has been deemed actionable under dilution rather than infringement law may have resulted from an incautious reading of the respective statutes; because the FTDA does not *expressly* require use of a mark "in connection with any goods or services," courts may have felt less constrained in applying it to allegations of domain name trafficking. Absence of the "in connection with any goods or services" language, however, cannot account for the distinction that has been made within dilution law between the registration of trademarks as domain names, which does not "constitute a commercial use under the [FTDA]," and the "attempt to sell the trademarks themselves," which does. *See Panavision,* 141 F.3d at 1324, 1325–26. Indeed, this court's analysis of the "commercial use in commerce" requirement leads to the conclusion that both registering and trafficking in domain names that incorporate protected trademarks should be treated the same under the FTDA. Arriving at this conclusion further reveals that dilution claims cannot be distinguished from infringement claims on the basis of the "in connection with goods or services" requirement. Rather, neither registering nor trafficking in a domain name, without having used it in connection with goods or services, violates either the infringement or dilution statutes. Such acts must be challenged, if at all, under the ACPA.

### 1. "Commercial Use in Commerce"

The parties in this case, similar to the majority of courts addressing the issue, have treated the dilution statute's "commercial use in commerce" requirement as a single element of their overall claim, rather than address its distinct parts. This court concludes, however, that it is helpful to conduct a separate analysis of whether selling a trademark as a domain name is (1) "commercial," (2) "use," and (3) "in commerce."

### a. "Commercial"

▆▆▆ "Commercial" generally is defined as relating to "the exchange or buy-

ing and selling of commodities" or "from the point of view of profit: having profit as the primary aim." *See* Webster's 3d New International Dictionary 456 (1981). Black's Law Dictionary similarly defines "commercial" as

> connected with trade and traffic or commerce in general; ... occupied with business and commerce. Generic term for most all aspects of buying and selling.

Black's Law Dictionary 270 (6th ed.1990) (citation omitted). Thus, the court concludes that a dilution claim under 15 U.S.C. § 1125(c) requires proof that the defendant has engaged in exchange (commonly through buying or selling), or other activities that have profit as their primary aim. Here, it is indisputable that Ford has sufficiently stated a claim that the EFF Defendants' activities are "commercial"; their alleged intent is to profit from the sale of domain names.

### b. "In commerce"

■■■ Similarly, it cannot be disputed that the EFF Defendants' trafficking activities are "in commerce." This requirement is satisfied if the defendants' trademark use falls within the scope of Congress's Commerce Clause powers under the Constitution. *See United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 92–93 (2d Cir.1997) ("It appears that 'use in commerce' denotes Congress's authority under the Commerce Clause ...."). Placing domain names for sale over the Internet unquestionably satisfies this criterion. *See Intermatic*, 947 F.Supp. at 1239–40 (quoting 1 Gilson, *Trademark Protection and Prac-*

*tice*, § 5.11[2], p. 5–234 (1996)) ("Because Internet communications transmit instantaneously on a worldwide basis there is little question that the 'in commerce' requirement would be met in a typical Internet message ....").[7] Accordingly, the only issue remaining is whether the EFF Defendants' actions constitute "use" as that word is to be understood within the meaning of the statute.

### c. "use"

■■■ It is well established that not all uses of trademark are infringing or dilutive. *See e.g., Avery Dennison Corp. v. Sumpton*, 189 F.3d 868 (9th Cir.1999) (noting that the dilution statute "requires the defendant to be using the trademark as a trademark, capitalizing on its trademark status"); *New Kids*, 971 F.2d at 307 (stating that certain infringement claims "are best understood as involving a non-trademark use of a mark—a use to which the infringement laws simply do not apply").

■■■ The line dividing use of a word or symbol in its trademark and non-trademark senses is determined, in significant part, by whether it is used in connection with goods or services. This conclusion is amply supported by the statutory trademark laws. For example, 15 U.S.C. § 1127 defines "use in commerce" to occur when a mark is "placed in any manner on the goods" or "used or displayed in the sale or advertising of services." 15 U.S.C. § 1127. Similarly, the terms "trademark" and "service mark" are themselves defined by statute as "any word, name, symbol, or device, or any combination thereof" that is "used by a person ... *to identify and*

---

**7.** The EFF Defendants undoubtedly would hasten to point out that a website is not "trasmit[ted]" instantaneously on a worldwide basis." Rather, a website can be thought of as "sitting" passively in a computer server until another computer "telephones" and requests that the website be sent over. Nevertheless, it has not been disputed that the EFF Defendants' offers to sell domain names over the Internet have traveled in interstate commerce.

*distinguish his or her goods [or services].*" *Id.* (emphasis added). Indeed, the very "function" of a trademark is "to distinguish goods and services." *Lockheed,* 985 F.Supp. at 960. *See also* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 3:1 at 3–2 (4th ed.2001) (observing that a word or symbol does not qualify as a trademark unless used "as a mark by a manufacturer or seller of goods or services"). For these reasons, the court concludes that, although not stated expressly, "use" under the FTDA is not use as a trademark unless it is in connection with goods or services.[8]

### 2. "Goods or Services"

Having determined that, like infringement claims, dilution claims brought pursuant to the FTDA require use of a trademark "in connection with goods or services," the court must next determine whether such use sufficiently has been alleged in this case. Ford asserts that it has stated a claim in support of this element (1) because the trademarks themselves are the goods in connection with which the trademarks are used and (2) because the EFF Defendants use of the Ford marks is in connection with Ford's own goods and services. For the following reasons, both theories must be rejected.

### a. Selling the trademarks themselves

Ford first argues that the "goods or services" requirement is satisfied because

the EFF Defendants are selling the trademarks themselves. In support of this proposition, Ford cites two cases: (1) *Panavision International, L.P. v. Toeppen,* 141 F.3d 1316 (9th Cir.1998) and (2) *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.,* 510 F.2d 1004 (5th Cir.1975). Each is addressed in turn below.

#### (i) *Panavision*

*Panavision* was one of the earliest cases to apply the FTDA's anti-dilution provisions against domain name cybersquatting. The defendant in that case—Dennis Toeppen of *Intermatic* fame[9]—was sued by Panavision International, L.P. ("Panavision") for trademark dilution after he registered the PANAVISION mark as a domain name and used it to display online photographs of the city Pana, Illinois. *Id.* at 1319. "Incidentally," Toeppen also sought $13,000.00 as an incentive to release the domain name to Panavision. *Id.* On appeal from the district court's award of summary judgment in Panavision's favor, the Ninth Circuit affirmed, focusing on the FTDA's "commercial use" and "dilution" elements.

#### (a) "Commercial use"

With regard to the commercial use requirement, the court concluded that "[i]t does not matter that [Toeppen] did not attach the marks to a product. [His] commercial use was his attempt to sell the trademarks themselves." *Id.* at 1325. A

---

**8.** This requirement likewise may be inferred from the FTDA's requirement that the "use in commerce" be "commercial." See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:76 at 25–229 (4th ed. 2001) ("While the statute does not require that there be advertising or a sale of goods or services, 'commercial use' implies a place where some business is carried on or goods or services are sold, distributed or advertised for sale.").

**9.** In *Intermatic Inc. v. Toeppen,* 947 F.Supp. 1227 (N.D.Ill.1996), Toeppen registered the domain name "intermatic.com", hoping to sell it to the holder of the INTERMATIC mark. The court in that case estimated that Toeppen had also registered as domain names the trademarks of about 240 other corporations. *Id.* at 1230.

later case addressing more innocuous facts, elaborated on this holding.

In *Avery Dennison Corporation v. Sumpton*, 189 F.3d 868 (9th Cir.1999), the defendant Jerry Sumpton registered thousands of domain name combinations—including "avery.net" and "dennison.net"—for use in his business of providing vanity email addresses to Internet users. *Id.* at 872. The plaintiff, Avery Dennison Corporation ("Avery Dennison"), sold office products and industrial fasteners under the trademarks AVERY and DENNISON, respectively, and desired the domain names for its own use. *Id.* at 873. When Avery Dennison brought suit for trademark dilution, the district court—following the *Panavision* analysis—granted summary judgment in Avery Dennison's favor. *Avery Dennison Corp. v. Sumpton*, 999 F.Supp. 1337, 1340 (C.D.Cal.1998).

On appeal, the Ninth Circuit reversed, distinguishing Sumpton's "commercial use" from that in *Panavision:*

> Commercial use under the Federal Trademark Dilution Act requires the defendant to be using the trademark as a trademark, capitalizing on its trademark status. Courts have phrased this requirement in various ways.... In our *Panavision* decision, we considered the defendant's "attempt to sell the trademarks themselves." All evidence in the record indicates that [Sumpton] register[s] common surnames in domain-name combinations and license[s] e-mail addresses using those surnames, with the consequent intent to capitalize on the surname status of "Avery" and "Dennison." [Sumpton] do[es] not use trademarks qua trademarks as required by the caselaw to establish commercial use. Rather, [he] use[s] words that hap-

pen to be trademarks for their non-trademark value.

*Avery Dennison*, 189 F.3d at 880. Because Sumpton had a legitimate, non-trademark use for the words "Avery" and "Dennison," the court concluded that he, not Avery Dennison, was entitled to summary judgment. *Id.*

Although the court, speaking generally, concluded that Sumpton's use of the AVERY and DENNISON marks was not "commercial use," it unquestionably was "commercial." Sumpton charged a $19.95 start-up fee, plus $4.95 annually thereafter for the rights to each vanity email address. *Id.* at 872. Indeed, the court itself appears to have focused on whether Sumpton's "use" was the type "required by the caselaw." *Id.* at 880. Careful examination of the two defendants' "uses" in *Panavision* and *Avery Dennison*, however, reveals that they essentially are indistinguishable from one another. In both cases the defendants registered the plaintiffs' exact marks as domain names and then trafficked in those marks. The only point of contrast in the two "uses" was each user's subjective intent. As evinced by their contrasting pricing practices and sales approaches, Toeppen clearly sought to extort while Sumpton pursued a more benign objective.

Even this distinction, however, is not highly significant. Both Toeppen and Sumpton—despite their differing subjective intents—stood to profit from the disputed domain names' status as trademarks. Although Sumpton did not directly adjust his prices to reflect the trademark value of his domain names, he nonetheless benefitted from the heightened interest a trademark holder has in controlling the domain that corresponds to its exact trademark.[10] Thus, the only

---

**10.** If, for example, the Ford surname had been among those registered as domain

names by Sumpton, there can be little doubt, based upon the court's experience in this

legitimate distinction between the *Panavision* and *Avery Dennison* cases was that Sumpton, not knowing he had registered trademarks as domain names, subjectively did not intend to profit from the value of Avery Dennison's marks. Toeppen, on the other hand, acknowledged his subjective intent to extort money from the mark holder.

While the distinction between an intentional cybersquatter's reprehensible conduct and another's unintentional tying up of a protected trademark is logical, subjective intent is not an appropriate consideration under the dilution or infringement statutes. The inconsistencies that arise from its insertion into the analysis are demonstrated in the *Panavision* court's treatment of the dilution element.

### (b) Dilution

To succeed on a claim under the FTDA, a plaintiff must demonstrate that the challenged use "causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c). In addressing this element, the *Panavision* court agreed that dilution traditionally is defined as "blurring" or "tarnishment." 141 F.3d at 1326.[11] Rather than determine whether Toeppen's cyberpiracy fit within these traditional bounds, however, the court "varied from the two standard dilution theories," and found that Toeppen's conduct satisfied the dilution requirement for other reasons. *Id.* First, Toeppen's use of the PANAVISION mark was deemed dilutive because "[u]sing a

company's name or trademark as a domain name is ... the easiest way to locate that company's website," and "potential customers of Panavision will be discouraged if they cannot find its web page by typing in 'Panavision.com,' but instead are forced to wade through hundreds of websites." *Id.* at 1327. *Accord Planned Parenthood v. Bucci*, No. 97 Civ. 0629(KMW), 1997 WL 133313 at *4 (S.D.N.Y. March 24, 1997) ("Prospective users of plaintiff's services who mistakenly access defendant's web site may fail to continue to search for plaintiff's own home page, due to anger, frustration or the belief that plaintiff's home page does not exist."). Second, Toeppen's use of "panavision.com" was dilutive of the PANAVISION mark because it puts Panavision's "name and reputation at his mercy." *Id.* at 1327. *Accord Intermatic*, 947 F.Supp. at 1240 ("If Toeppen were allowed to use 'intermatic.com,' Intermatic's name and reputation would be at Toeppen's mercy and could be associated with an unimaginable amount of messages on Toeppen's web page.").

Apparently uncomfortable with the broad scope of the *Panavision* holding, courts have limited application of the "dilution by cybersquatting" analysis—again to cases involving bad faith intent. Thus, in *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F.Supp.2d 117 (D.Mass.1999), *aff'd by* 232 F.3d 1 (1st Cir.2000), Hasbro, the holder of the CLUE mark and manufacturer of the Clue board game, sued a computer services provider called Clue Computing, Inc.,

---

case, that Ford would have found in Sumpton's use a "bad faith intent to profit" from the value of its mark.

**11.** Incidentally, the court defined both "blurring" and "tarnishment" as requiring use of the mark in connection with goods or services.

Blurring occurs when a defendant uses a plaintiff's trademark to identify *the defen-*

*dant's goods or services,* creating the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product. Tarnishment occurs when a famous mark is improperly associated with an inferior or offensive *product or service.* *Panavision,* 141 F.3d at 1326 n. 7 (supporting citations omitted) (emphasis added).

which operated over the Internet through the "clue .com" domain. Hasbro urged the court to adopt what it characterized as the "third, 'per se', category of dilution—use of another's trademark as a domain name." *Id.* at 132. The court rejected the plaintiff's arguments, however, because it found that Clue Computing was engaged in a legitimate use of the mark:

> I join those courts finding that, while use of a trademark as a domain name to extort money from the markholder or to prevent that markholder from using the domain name may be per se dilution, a legitimate competing use of the domain name is not.

*Id.* at 133. *See also Intermatic,* 947 F.Supp. at 1240 ("This is not a situation where there were competing users of the same name by competing parties and a race to the Internet between them.")

The theory that a defendant's use of a trademark as a domain name constitutes "dilution" only when the defendant is acting with intent to profit from the domain name's status as a trademark is flawed. Use of a trademark as a domain name by someone other than the mark holder—regardless for what purpose—always has the "dilutive" effect complained of in *Panavision:* (1) it precludes the mark holder from using the website that it believes customers will locate most easily and (2) it subjects the mark holder's name and reputation to the mercy of the domain name registrant.[12] If "dilution," as that term is to be understood under the FTDA, truly occurs when a mark holder is prevented

from using the Internet domain that it believes is most accessible to its customers or when the mark holder's name is subjected to the mercy of another, the FTDA should provide a remedy regardless of the domain name registrant's subjective intent.[13]

Pointing out divergent roads is, of course, not the same as taking the right one. This court concludes, however, that it must depart from the path taken by the majority of courts. The following statement, compiled from a number of cases by the District Court for the Eastern District of Pennsylvania, explains why.

> [I]t is clear that nothing in trademark law requires that title to domain names that incorporate trademarks or portions of trademarks be provided to trademark holders. To hold otherwise would create an immediate and indefinite monopoly to all famous marks holders on the Internet, by which they could lay claim to all .com domain names which are arguably "the same" as their mark. The Court may not create such property rights-in-gross as a matter of dilution law. Trademark law does not support such a monopoly.

*Strick Corp. v. Strickland,* 162 F.Supp.2d 372, 380 (E.D.Pa.2001) (internal quotations, citations, and alterations omitted). Civil law trademark claims do not depend for their success upon the subjective intent of the user. Moreover, dilution does not occur simply because a trademark holder has been foreclosed from advertising in his preferred forum. Because Ford's theory

---

**12.** While the existence of a competing legitimate use probably lowers the likelihood that a domain name registrant would *intentionally* defame the mark holder, the mark holder still loses control over whatever message is broadcast from the webpage. That message is controlled by the registrant and potentially can be harmful, whether intentionally or only incidentally so.

**13.** The court further observes that even mere registration of a trademark as domain name, which most courts—including the *Panavision* court—have found non-actionable under the FTDA, has the same "dilutive" effect described in *Panavision* with regard to trafficking.

that the goods or services in domain name cybersquatting are the marks themselves would compel a contrary result, it is rejected by the court.

This conclusion is consistent with the nearly unanimous holding of courts that mere registration of another's trademark as a domain name is insufficient to support a cause of action for dilution. Registering a domain name is both "commercial," in that a yearly fee is required, and "in commerce," at least when it occurs, as is typical, over the Internet. Thus, although courts upholding mere registration have broadly stated that registration is not "commercial use," it is logical to conclude that the failing in those cases was the defendant's failure to "use" the mark as a trademark, that is, in connection with goods or services.

### (ii) *Boston Pro. Hockey*

The case *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.,* 510 F.2d 1004 (5th Cir.1975), also relied upon by Ford, is not on point. The defendant in that case was selling embroidered emblems that could be attached to shirts, hats, and other items of clothing. The emblems depicted trademarked symbols of various hockey teams belonging to the National Hockey League ("NHL"). In addressing the NHL's infringement claims, the court observed that its analysis was made more difficult by "the fact that a reproduction of the trademark itself is being sold unattached to any other goods or services." *Id.* at 1010. This statement, however, was not the court's last word on the subject. In later discussing whether the symbols had been used in connection with the sale of goods, the court elaborated:

Defendant is in the business of manufacturing and marketing emblems for wearing apparel. These emblems are the products, or goods, which defendant sells. When defendant causes plaintiffs' marks to be embroidered upon emblems which it later markets, defendant uses those marks in connection with the sale of goods as surely as if defendant had embroidered the marks upon knit caps. The fact that the symbol covers the entire face of defendant's product does not alter the fact that the trademark symbol is used in connection with the sale of the product.

*Id.* at 1011. Thus, although it initially may have appeared to the contrary, the defendant's use of the hockey teams' trademarks was not, in fact, "unattached to any goods or services." The product sold by the defendants was not the mark itself, but a cloth emblem carrying a reproduction of the mark. Because the NHL teams sold clothing and other similar products bearing their marks, the court was justified in concluding that a reasonable person could be confused as to the source of the emblems. Here, to the contrary, Ford's marks truly are being used by the EFF Defendants unattached to any goods or services. The EFF Defendants have not used the domain names as web sites from which to advertise goods or services. Rather, they have merely obtained rights to use certain domain names and wish to transfer those rights.

 Moreover, to the extent that *Boston Professional* attempted to treat the marks as "goods," the Fifth Circuit later retracted, forswearing "any notion that a trademark is an owner's 'property' to be protected irrespective of its role in the protection of our markets." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368 (5th Cir.1977); *cf. United States v. Giles,* 213 F.3d 1247, 1251 (10th Cir.2000) (rejecting *Boston Professional* in criminal infringement prosecution and holding that "[t]he 'goods' at issue in this case are the purses and handbags

to which the patch sets could be applied. The patch sets are not goods, but labels"). For these reasons, the court concludes that the implication in *Boston Professional* that trademarks are themselves "goods or services" must be rejected.

### b. Ford's "goods or services"

Finally, Ford relies on the case *Planned Parenthood Federation of Am., Inc. v. Bucci*, No. 97 Civ 0629(KMW), 1997 WL 133313 (S.D.N.Y.1997), in which the court held that a defendant's action "in appropriating plaintiff's mark has a connection to *plaintiff's* distribution of its services," because it "is likely to prevent some Internet users from reaching plaintiff's own Internet web site." *Id.* at *4 (emphasis in original).

■■■ The court rejects this analysis for two reasons. First, it is dictum. It was undisputed in *Planned Parenthood* that the defendant had begun operating a web-page under the disputed domain name, from which he was promoting anti-abortion literature. *Id.* at *2, 5. This presumably satisfied the "goods or services" requirement, thus making it unnecessary for the court to link the defendant's use of the mark to the plaintiff's goods and services. Furthermore, courts soundly have rejected the *Planned Parenthood* dictum, noting that

trademark law requires reasonableness on the part of consumers. Although the need to search for a mark holder's site "may rise to the level of inconvenience, this inconvenience [is] not cognizable." An Internet user who intends to access either party's products or services, but who has not done so before, may go to a search engine, or on America Online, to Keyword. Any inconvenience to an Internet user searching for Plaintiff's web site is trivial. Searches for Plaintiff's web page on popular internet search engines, including google.com, goto.com, and lycos.com, list Plaintiff's web site as their first or second "hits."

*Strick*, 162 F.Supp.2d at 379 (internal citations omitted). The *Planned Parenthood* argument is particularly weak where, as here, the domain name does not precisely correspond with the protected mark. Ford's lack of ownership of every domain name that includes the word "ford" does not foreclose or seriously hinder its presence or the use of its trademark on the Internet. Accordingly, the court concludes that the "goods or services" requirement is not satisfied simply because the defendant's use may make it more difficult for some Internet users to locate Ford's goods and services online.

## IV. CONCLUSION

For all the foregoing reasons, the court concludes that neither registering, nor warehousing, nor trafficking in a domain name that incorporates a protected trademark is alone sufficient to support claims of trademark infringement or dilution. Both causes of action require use of a trademark in connection with goods or services, which, in the cybersquatting context, generally will require evidence that the domain was used to host a website from which goods or services have been offered over the Internet.

Ford and other trademark holders are, of course, not without a remedy against the objectionable acts of cybersquatters who register, warehouse, or sell domain names for the sole purpose of extorting money from trademark holders. Indeed, the ACPA appropriately regulates the otherwise "first-come, first-serve" policy of distributing domain names by taking into account the legitimate competing interests that might exist in a given domain name. Thus, cybersquatting claims must be brought, if at all, under the ACPA. In-

fringement and dilution claims cannot be stretched to govern such facts and thus must be dismissed as against both the EFF Defendants and Great Domains.

Accordingly, IT IS ORDERED that Defendant Greatdomains.com Inc.'s Rule 12(b)(6) motion to dismiss is GRANTED.

IT IS FURTHER ORDERED that the EFF Defendants' Rule 12(b)(6) motions to dismiss are GRANTED IN PART and DENIED IN PART. While Ford's ACPA claim may proceed, its infringement, unfair competition, and dilution claims must be dismissed.